STATE of Maine

v.

Paul B. RAND.

Supreme Judicial Court of Maine.

Argued Jan. 20, 1981.

Decided June 8, 1981.

Janet Mills, Dist. Atty., J. Scott Davis, Asst. Dist. Atty., South Paris (orally), for plaintiff.

Gauvreau & Thibeault, Paul Thibeault, Lewiston (orally), for defendant.

Before WERNICK, GODFREY, NICHOLS, ROBERTS and CARTER, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Acting Retired Justice.

Convicted by jury in the Superior Court, Oxford County, of burglary (17–A M.R.S.A. § 401(1), (2)(C)—a Class C crime, punishable by imprisonment for a definite period not to exceed 5 years, 17–A M.R.S.A. § 1252(2)(C)) and of theft (17–A M.R.S.A. § 353—a Class E crime, punishable by imprisonment for a term not exceeding 6 months, 17–A M.R.S.A. § 362(1), (5), § 1252(2)(E)), and sentenced to the Maine State Prison to a term of 5 years on the burglary and 6 months on the theft, Paul Rand, the defendant appeals. We sustain the appeal and vacate the judgments.

The JDS Corner Market in South Paris was broken into just before midnight on November 27, 1979. Awakened by noise coming from the store next door, Richard Ramsey, a mechanic by trade, investigated from his second floor bedroom window and saw two men with long hair emerge from the rear of the market carrying boxes the size of beer cases. One of the men caught his vest on Ramsey's woodpile as they cut across his yard toward the street. Hurrying downstairs to his front door, Ramsey saw through the glass two men running across the street into the shadows of a parking lot. He testified that he could not identify the two individuals, except that they had long hair and thought the taller man had a plaid shirt with an outside vest like a ski vest, while the shorter person wore dark clothing. When dialing the police from his phone by the door, Ramsey heard the roar of an automobile which pulled out of the parking lot into the glare of the street lamps heading down Western Avenue; relating what he was observing, Ramsey told the police that he thought the car was a 1972 to 1974 Chevrolet, gold or bronze in color, with a V-type arrangement on the back window.

Officers Marston and Henderson of the South Paris police department arrived at the scene around midnight. Ramsey recounted his observations and the officers thereafter made an exterior check of the area while Ramsey notified the owner of the store by phone. Officer Marston found a roll of pennies by Ramsey's woodpile and made the observation that a window on the second floor of the market had been broken. Resuming their patrol of the area for some ten minutes, the officers returned to the

market without spotting the fleeing automobile.

By that time the owner had arrived and the officers were let in the store. Papers and boxes were strewn about by the cash register and a vent in the ceiling was kicked open. Missing, insofar as the owner could determine, were approximately fifteen cases of beer, including Michelob, twelve cartons of cigarettes, including Marlboro, some thirty rolls of pennies such as had been found near Ramsey's woodpile, a plastic bag containing unrolled pennies, and about ten dollars in loose change that had been left in the cash register. It was a day or two later that a complete inventory revealed the additional loss of about one hundred blank checks and miscellaneous deposit slips.

Prior to resuming their search for the fleeing automobile, the officers noticed two pairs of bootprints which were plainly visible up to the point where Ramsey had seen the car drive off; one of the two markings showed a smooth imprint. About one hour later, when making a turn onto Gothic Street, the officers spotted a gold Chevrolet car, matching Mr. Ramsey's description, parked in a driveway between apartments 59 and 61. Stopping to investigate, the officers walked up the driveway with flashlights. They noted that, unlike other parked cars, the Chevrolet's windows were clear of frost; bootprints similar to the two prints observed previously near the Corner Market were seen on the ground beside the car; fingerprints were visible on the trunk. The officers testified that they did not search the car at that time, nor did they shine their lights into the interior of the vehicle, but retreated to their cruiser to seek information as to the owner of the suspect automobile based on its license plate. They were informed the car belonged to the defendant, Paul Rand.

While waiting for the district attorney's advice which they had commissioned a third officer to obtain, the officers saw some unidentifiable person leaving one of the apartments get in the Chevrolet and drive off. They followed the properly driven automobile for approximately a mile and one half before stopping the vehicle. Approaching from both sides, the officers flashed their lights in the car. Officer Marston testified that, prior to reaching the driver, he saw two six-packs of Michelob on the floor behind the passenger's seat, a roll of pennies and some loose change on the floor behind the driver's seat, with two packs of Marlboro cigarettes protruding therefrom.

Paul Rand, who, so the officer testified, had shoulder-length hair at the time, was then informed why he was stopped. After refusing the officer's request for permission to search the car, Rand was told by Officer Marston that he was under arrest for burglary and theft. The Chevrolet was then locked and towed to a clearing by a woods road about one hundred yards behind the home of Officer Bradley Taylor, another member of the South Paris police department, where it remained undisturbed for some six hours, until it was further towed to the fenced-in impoundment area behind the county jail.

The next day, the police obtained a warrant to search Rand's vehicle, but executed the same a day later. In addition to the articles they had observed at the time of arrest, the officers found a carton of Winston cigarettes, a plastic bag containing loose pennies, ten rolls of pennies, four cases of beer, including Budweiser, and some one hundred blank checks stamped with the name of the JDS Market, besides miscellaneous deposit slips. The items retrieved from the car were "not anywhere near half" of the property taken.

I

While several questions are presented on appeal, we will first consider the trial Court's only reversible error, the refusal of the defendant's request to instruct the jury on theft by receiving under 17–A M.R.S.A. § 359.[1]

1. 17–A M.R.S.A. § 359. *Receiving stolen property*

1. A person is guilty of theft, if he receives, retains or disposes of the property of another

A person who enters or surreptitiously remains in a structure such as the Corner Market store in this case, knowing that he is not licensed or privileged to do so, with the intent to commit a crime therein, is guilty of burglary. 17–A M.R.S.A. § 401. This provision of the Maine Criminal Code, effective May 1, 1976, preserves the essential elements of the pre-Code offense of burglary, save the common law requirement that there be a "breaking." *See State v. Luce*, Me., 394 A.2d 770, 773 (1978); Comment to Section 401 (Pamphlet 1980).

The crime of burglary is complete when the defendant makes an unauthorized entry into a structure if at the time of his entry into the building he entertains the actual intent to commit a specific crime therein, which may be theft by unauthorized taking. *State v. Field*, Me., 379 A.2d 393, 395 (1977). The burglar, after making his unauthorized entry with the intent to commit the crime of theft by taking, may change his mind and come out empty-handed; he still could be prosecuted for burglary. But, if he did commit the crime of theft by taking which he intended to commit when entering, he would be subject to prosecution for both burglary and theft, since he would have committed two crimes and could be convicted of both offenses. 17–A M.R.S.A. § 401(3); *see State v. Gatcomb*, Me., 389 A.2d 22, 25 (1978).

Prior to the adoption of the Maine Criminal Code, the offense of receiving, now known as theft by receiving, was a distinct and substantive crime in itself, and was not merely accessorial to the offense of larceny or theft by taking. *Nissenbaum v. State*, 135 Me. 393, 395, 197 A. 915 (1938). And,

the statutory offense of receiving stolen property was viewed conceptually as excluding the person guilty of the actual caption and asportation, *i. e.* the original thief. Philosophically speaking, the receiving of stolen property had to be subsequent to the theft of the property and not be a part of the original larceny; in other words, a single act may not constitute both the larceny and the receiving. *State v. Dall*, Me., 305 A.2d 270, n. 1 (1973); *State v. Thibodeau*, Me., 317 A.2d 172, 180 (1974). *See also State v. Slate*, 38 N.C.App. 209, 247 S.E.2d 430, 433 (1978); *Hardin v. Commonwealth*, Ky., 437 S.W.2d 931 (1968). Procedurally, the fact that the indictment charged the offense of receiving by alleging its commission in the various statutory modes possible did not require the State to prove all the modes of conduct stated. *State v. Jackson*, Me., 331 A.2d 361 (1975); *State v. Creamer*, Me., 379 A.2d 733 (1977).

Thus, if an indictment charged burglary in one count and receiving stolen property in another, the defendant could not be adjudicated guilty of the crime of receiving stolen property, where the evidence disclosed that the subject property of the count of receiving was the identical property proven to have been taken by the accused in the burglary, since the actual thief cannot receive from himself the fruits of his larceny. *People v. Morales*, 263 Cal.App.2d 211, 69 Cal.Rptr. 553 (1968).

The Maine Criminal Code, however, under 17–A M.R.S.A. § 351 consolidated various modes of conduct into one single crime of theft; now, the receiver of stolen property is also a "thief." [2] It further made

---

knowing that it has been stolen, or believing that it has probably been stolen, with the intention to deprive the owner thereof.

2. As used in this section, "receives" means acquiring possession, control or title, or lending on the security of the property. For purposes of this section, property is "stolen" if it was obtained or unauthorized control was exercised over it in violation of this chapter.

**2.** 17–A M.R.S.A. § 351 *Consolidation*

Conduct denominated theft in this chapter constitutes a single crime embracing the separate crimes such as those heretofore known as larceny, larceny by trick, larceny by bailee, embezzlement, false pretenses, extortion, blackmail, shoplifting and receiving stolen property. An accusation of theft may be proved by evidence that it was committed in any manner that would be theft under this chapter, notwithstanding the specification of a different manner in the information or indictment, subject only to the power of the court to ensure a fair trial by granting a continuance or other appropriate relief if the conduct of the defense would be prejudiced by lack of fair notice or by surprise.

for more procedural flexibility in permitting proof of the crime of theft, as broadly conceived under the consolidation, by evidence of any manner of conduct defined as theft in the Code, notwithstanding that the manner of conduct proven is different from that alleged in the accusation. Thus, a specific allegation of theft by unauthorized taking pursuant to 17–A M.R.S.A. § 353 will support evidentiary proof of theft by receiving and vice versa. The consolidation, however, was not intended to bring about a conceptual change of substance in criminology, but merely effected a procedural mechanism to avoid insubstantial variances and prevent the possibility of a miscarriage of justice by virtue of a person being charged with the wrong offensive conduct. *See* Comment to Section 351 at 134 (Pamphlet 1980).

 In the instant case, the Superior Court Justice instructed the jury to the effect that—

> "[i]f you find that the State has proved beyond a reasonable doubt that a burglary took place and the defendant had exclusive possession of property taken in that burglary, and that property had been recently stolen, you may draw the inference that the defendant committed the burglary and also the theft. Now, you may draw that inference, you do not have to, you are not compelled to draw such an inference."

The instruction is proper in this jurisdiction and the defendant does not complain of its being given. *State v. Saba*, 139 Me. 153, 27 A.2d 813, 816 (1942); *State v. King*, Me., 379 A.2d 131, 133 (1977) and cases cited therein. *See also State v. Langley*, Me., 242 A.2d 688, 689 (1968) involving robbery. The defendant, however, claims that the Court's denial of his request to charge the jury specifically respecting the crime of theft by receiving stolen property pursuant to 17–A M.R.S.A. § 359, a Class E crime in this case, the commission of which would be inconsistent with the charge of burglary, a Class C crime, prejudiced his rights in preventing him from developing the theory of his defense that the evidence before the jury

presented a rational basis for them to find him guilty of the lesser crime and exonerate him of any guilt of the greater offense.

In this we agree. Where the evidence is such that a rational jury could have determined that the accused was guilty of the lesser offense and not guilty of the greater, it is reversible error for the presiding justice not to instruct the jury on request respecting the lesser offense and to refuse to submit the issue to the trier of facts. The theory of the defense must be presented to the jury, provided it has rational support in the evidence. *State v. Carmichael*, Me., 405 A.2d 732, 736 (1979). *See also State v. Goodall*, Me., 407 A.2d 268, 279 (1979); *State v. Tibbetts*, Me., 379 A.2d 735, 737 (1977).

In the instant case, there was sufficient evidence providing a rational basis for a jury finding that the defendant, by virtue of his exclusive possession of much less than one half of the property taken from the Corner Market, was guilty of receiving the stolen property, and was not guilty of the original burglary or theft by taking. Only the defendant's automobile was expressly placed at the scene of the burglary; the defendant himself was not identified as one of the two long-haired individuals who entered the Corner Market more than one hour prior to the time when the defendant's vehicle was stopped by the officers. There was testimony that Rand at times did lend his car to friends living at the apartment on Gothic Street. The evidence throws no light on how many people were present at the apartment, when the defendant emerged therefrom and is consistent with the two burglars observed by Mr. Ramsey remaining at the apartment. Officer Marston did testify in effect he had information that, following the burglary, somebody at the apartment on Gothic Street might have been distributing some of the stolen goods from a garage in the rear of the building.

 True, we are not so naive as not to recognize that the jury might have returned verdicts of guilty of burglary and theft by taking as they did, even if they had been properly instructed respecting theft by

receiving and specifically informed of the existing exclusivity between the crime of burglary and that of theft by receiving stolen property. That judgment of fact in the circumstances of this case was for the jury under proper guidance. *Franklin v. United States*, 382 A.2d 20 (D.C.App.1978). A verdict of guilty of receiving would have a rational basis in the evidence, and refusal to instruct thereon cannot be justified on the ground that the evidence merely raised speculation or conjecture as was the case in *State v. Benson*, 155 Me. 115, 123, 151 A.2d 266, 270 (1959).

Where the jury was properly instructed to the effect that recent and exclusive possession of stolen goods may give rise to an inference that the person in such possession has committed the theft by taking and/or the burglary, and where on the basis of the evidence, there is a rational basis for a finding by the jury that the defendant is guilty of the offense of theft, but only of theft effected by receiving the stolen property knowing that it had been stolen or believing that it has probably been stolen, it is reversible error to fail to give specific instructions on request of the defendant to the effect that, if the accused was merely a receiver of stolen property, *i. e.* a person other than the individual who committed the original theft by taking, then the inference arising from recent and exclusive possession of stolen goods would not apply to support a finding that the accused was the burglar. *See Jenkins v. United States*, 10th Cir., 361 F.2d 615 (1966); *People v. Morales*, 263 Cal.App.2d 211, 69 Cal.Rptr. 553 (1968); *United States v. Jones*, 8th Cir., 418 F.2d 818 (1969); *Shepp v. State*, 87 Nev. 179, 484 P.2d 563 (1971); *State v. Koton*, 157 W.Va. 558, 202 S.E.2d 823 (1974); *Commonwealth v. Obshatkin*, 2 Mass.App. 1, 307 N.E.2d 341 (1974); *State v. Para*, 120 Ariz. 26, 583 P.2d 1346 (1978).

Justification for the failure so to instruct was placed on the provisions of 17–A M.R.S.A. § 13–A(3), which reads as follows:

3. The court in its discretion may instruct the jury to consider, or may as factfinder consider, any other offense or another alternative of the offense charged, although that other offense or alternative is not a lesser included offense, if:

A. On the basis of the evidence, there is a rational basis for finding the defendant guilty of the other offense;

B. The other offense does not carry a greater penalty than the offense charged;

C. Both the State and the defendant consent to the consideration of the other offenses by the factfinder; and

D. The defendant waives any applicable right to an indictment for the other offense.

When the other offense is defined in such a manner that it may be committed in alternative ways, the court may instruct the jury to consider, or may as factfinder consider, any alternative which meets the requirements of this subsection.

The State objected to the giving of the requested instruction on receiving stolen property. The presiding Justice ruled that under Section 13–A(3) the objection of the prosecutor precluded the court from exercising any discretion in the matter and the prosecution's position was sustained. This was error.

Initially, we may state that we are not dealing with a lesser included offense, as the crime of theft by receiving stolen property is not a lesser included offense of the crime of burglary. *State v. Miller*, 18 N.C.App. 489, 197 S.E.2d 46, cert. denied 283 N.C. 757, 198 S.E.2d 727 (1973). *See State v. Luce*, Me., 394 A.2d 770 (1978).

We conclude that the reference in section 13–A(3) to "any other offense or another alternative of the offense charged" was not intended to comprehend the crime of theft when actually charged with the crime of burglary respecting identical goods. We view the particular stated specifications of the manner or mode of commission of theft as a charge of any of the other alternative modes, subject to the power of the court, pursuant to 17–A M.R.S.A. § 351, to ensure a fair trial by granting a continu-

ance or other appropriate relief if the conduct of the defense would be prejudiced by lack of fair notice or by surprise. *See State v. Viger*, Me., 392 A.2d 1080, 1085, n. 5 (1978). Otherwise, if an indictment or information purported to accuse the defendant of theft by specifying only one manner of committing the offense, either by taking or by receiving, then the other alternative not specifically mentioned could be or could not be considered depending upon the election of either the State or the accused, which would frustrate the very purpose of the statutory provisions of section 351.

■■■■■ A thing may be within the letter of the statute and yet not be within the statute because it is not within its spirit nor within the intention of its makers. *State v. Day*, 132 Me. 38, 41, 165 A. 163 (1933). The Legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction and illogicality. *State v. Larrabee*, 156 Me. 115, 121, 161 A.2d 855, 857 (1960).

Even though the judgment is vacated for error in jury instructions, certain claimed errors in rulings at pre-trial proceedings should be considered and laid to rest so as to prevent their recurrence upon any new trial.

## II

The defendant attacks the Court's ruling denying his motion to suppress for use as evidence at his trial certain real evidence which he maintains was unlawfully seized as a result of an unlawful seizure and search of his automobile. Rule 41(e), M.R. Crim.P.

## A

Initially, he claims procedural error at the suppression hearing in that he was compelled, over his objection, to carry the burden of producing the evidence to support his contention that the police seizure and search were constitutionally unlawful, while conceding that the ultimate burden of persuasion respecting their legality was properly left with the State.

■■■■■ In considering this procedural issue, we must keep in mind the well recognized basic constitutional rule that searches or seizures conducted without a warrant are *per se* unreasonable, except for a few carefully drawn and much guarded exceptions. *State v. Johnson*, Me., 413 A.2d 931, 933 (1980); *State v. Dunlap*, Me., 395 A.2d 821, 824 (1978). Upon a motion to suppress the fruits of a warrantless search, even though the accused be the moving party, the burden is on the State, by a preponderance of the evidence, to establish the existence of the exception justifying the failure to obtain a warrant. *State v. Johnson, supra; State v. Dunlap, supra; Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). On the other hand, if a defendant seeks to challenge the legality of a search or seizure conducted under a properly issued and executed warrant, he has the burden of proving the illegality. *State v. Gamage*, Me., 340 A.2d 1 (1975); *State v. Appleton*, Me., 297 A.2d 363 (1972); *Chin Kay v. United States*, 9th Cir., 311 F.2d 317 (1962).

■■■■■ The record indicates that the presiding Justice did place on the defendant the burden of going forward with evidence, otherwise known as the burden of evidence or explanation as distinguished from the burden of proof,[3] resting his ruling upon the hypothesis that he was dealing with the admissibility of evidence seized on November 30 under a properly issued and executed warrant. In this there was error. The defendant was objecting to the initial seizure of Rand's vehicle on the road on November 28. The Fourth Amendment to the Constitution of the United States applies to seizures of the person in the setting of brief investigatory stops, whether the person be on foot or in a vehicle. *United States v. Cortez*, —— U.S. ——, 101 S.Ct. 690, 694, 66

---

**3.** For the distinction between the burden of proof and the burden of evidence, *see Buswell v. Fuller*, 89 Me. 600, 36 A. 1059 (1897); *Foss v. McRae*, 105 Me. 140, 73 A. 827 (1909); *State v. Buckley*, 125 Me. 301, 133 A. 433 (1926).

L.Ed.2d 621 (1981); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–1879, 20 L.Ed.2d 889 (1968). The police had no warrant to support this seizure. Thus, the Court below should have made its ruling, in reference to the question of the burden of evidence, on the basis of the factual existence initially of a warrantless seizure.

A party charged from the outset with the burden of proof or persuasion with respect to a particular issue ordinarily has the subsidiary burden of going forward with evidence regarding such issue. *See Kittery Electric Light Co. v. Assessors of Town*, Me., 219 A.2d 728, 743 (1966); 31A C.J.S. Evidence § 110, p. 186, and cases cited at note 34. This applies to Fourth Amendment suppression hearings pursuant to Rule 41(e), M.R.Crim.P. Hence, the State in the instant case had the burden of producing evidence respecting the validity of the initial stop.

Assuming, however, without deciding, that the test to be used, in determining whether the wrongful allocation of the burden of evidence in a suppression hearing in a criminal case constitutes reversible error, is the beyond-a-reasonable doubt standard, we conclude that the error in the instant case did not work an undue hardship or result in prejudice to the accused, and we are so satisfied beyond a reasonable doubt. Though forced to conduct the direct examination of the police officers whose activity he was challenging, Rand's counsel was never hindered in leading those witnesses, nor in trying to attack their honesty and credibility. On appeal, the burden of showing prejudicial impact by reason of the imposition of an erroneous allocation of the burden of evidence is on the appellant. The same rule applies when error in the order of proof is involved. *See State v. Harrington*, 128 Vt. 242, 260 A.2d 692, 698 (1969); *State v. Bennett*, 158 Me. 109, 112, 179 A.2d 812, 814 (1962); *United States v. Montgomery*, 3rd Cir., 126 F.2d 151, 153 (1942), cert. denied, *Montgomery v. United States*, 316 U.S. 681, 62 S.Ct. 1268, 86 L.Ed. 1754.

B

The defendant asserts error of substance in the Court's ruling denying his suppression motion on the ground that the original stop of his vehicle by the police was in violation of his Fourth Amendment rights. This, he contends, fatally vitiated his arrest, the seizure of his car and the later search of the vehicle, even though the latter was under the authority of a search warrant. We disagree.

1. *Legality of police observations secured on private property*

As noted previously, some of the information relied upon by the police, in stopping the Rand vehicle as the defendant was traveling towards his home, had been secured sometime earlier when the car was parked in a private driveway on Gothic Street. Prints on the ground similar to those seen at the scene of the burglary, fingerprints on the car trunk, the frostless appearance of the car's windows, the license plate of the vehicle, with the aid of artificial lighting, were all observed by the officers after their approach to the automobile by walking up the driveway. We recognize that, absence existent circumstances, the mere fact the police are conducting an official investigation does not authorize or justify resort to police intrusions without consent upon private property in breach of reasonable expectancies of privacy. *See State v. Richards*, Me., 296 A.2d 129, 137 (1972); *State v. Crider*, Me., 341 A.2d 1, 5 (1975).

The Gothic Street driveway, running as it does from the street to the two multiple-housing buildings at the end thereof and serving as a walkway or path to provide access to people to and from the several apartments therein, negates an actual subjective absolute expectation of privacy on the part of the occupants, but admits of a reasonable expectation that various members of society may use the driveway in their personal or business pursuits with persons residing therein, including the police on legitimate police business.

Police officers in the performance of their duties may, without violating the constitution, peaceably enter upon a common driveway of a multiple dwelling without a warrant or express permission to do so. It is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with suspects or witnesses at their homes. No colorable Fourth Amendment question would have arisen from the fact the officers, if they had so chosen to do, had walked up the driveway to the door of the lit-up apartment in order to knock on the door and to seek information respecting the suspect car in the driveway. Thus, knowledge obtained by the officers respecting matters outside the interior of the automobile was in no way acquired in violation of Fourth Amendment rights, since the driveway did not afford, at least to the extent used in this case, the security of an area in which society would deem an expectation of privacy to be reasonable. *See State v. Crider, supra*, at 4–5; *State v. Corbett*, 15 Or.App. 470, 516 P.2d 487 (1973); *State v. Daugherty*, 94 Wash.2d 263, 616 P.2d 649, 651 (1980). *See also State v. Warner*, Me., 237 A.2d 150, 160 (1967).

### 2. *Legality of stop*

Without intimating any opinion whether the officers, from their observations acquired at the driveway location on Gothic Street and the information they previously had obtained at the scene of the burglary, had probable cause to believe that the operator of the gold-colored Chevrolet with unique rear window pattern had been, and actually was, engaged in the criminal activity they were investigating, the evidence accumulated at that point surely permitted an investigatory stop.

To justify an investigatory stop of a moving automobile, deemed in law a temporary seizure of the vehicle, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants. A showing of probable cause is not necessary. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Given specific and articulable facts, the investigating officer may question the driver and passengers.

The instant stop was unquestionably within constitutional limits in view of the totality of the information which the officers possessed at that time. Indeed, the facts known to the officers when they followed the car from the driveway on Gothic Street were certainly sufficient to justify a brief detention for the purpose of establishing the identity of the operator and getting some explanation in relation to its prior use that night, especially in view of the similarity of prints in the driveway and those observed at the scene of the burglary. As stated in *State v. Chattley*, Me., 390 A.2d 472, at 475 (1978), even though there may not be sufficient facts to provide probable cause for arrest, police officers have a limited right under appropriate circumstances to stop a suspect for questioning and investigation. Such was the case here. *See also State v. Gervais*, Me., 394 A.2d 1183 (1978); *State v. Babcock*, Me., 361 A.2d 911 (1976).

### 3. *Legality of arrest*

As a result of a *lawful* stop of Rand's vehicle, Officer Marston when approaching the car flashed his light into the interior of the automobile and spotted in plain view similar items such as beer, cigarettes and coins which had been taken in the burglary a short time previously. The operator of a vehicle on a public road is held to have exposed property to public view notwithstanding that artificial illumination, specifically directed, might be required to render the property visible. *State v. Chattley, supra*, at 476; *State v. Stone*, Me., 294 A.2d 683, 688 (1972).

Where, as here, the officers, in addition to the knowledge they already had regarding the burglary, learned during their *Terry*-type stop of the vehicle that the car did contain items of a similar nature as

those taken in the burglary a short time previously, they may use those added facts, together with the totality of the existing stock of information which they already possessed, to support a finding of probable cause to make the subsequent arrest that they did. The officers then had facts and circumstances sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or was being committed by the operator of the vehicle. *See Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *See also United States v. Hilton*, 469 F.Supp. 94 (U.S.D.C.Me., 1979); *United States v. Thevis*, 469 F.Supp. 490 (U.S.D.C.Conn.1979).

Given facts supportive of probable cause to arrest, no arrest warrant was required in the instant case, whether the officers believed that Rand had actually participated in the commission of the burglary and was fleeing with the stolen property, a Class C crime (17–A M.R.S.A. § 15(1)(A)(2)), or whether they believed he was committing in their presence the crime of theft of the Class E variety (Id. § 15(1)(B)). *See United States v. Watson*, 423 U.S. 411, 423, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 598 (1976).

Also, due to the hour of the night, the shortness of time since the burglary, the unexpected discovery of the suspect vehicle and the fact that only one of the probable burglars was in the car, the police had the right, simultaneously with the arrest of the defendant, to seize and remove the car to police custody as the instrumentality and evidence of the crime of burglary and for the purpose of preventing thereby the potential loss of valuable evidence contained therein to their actual knowledge.

### 4. *Legality of search of automobile pursuant to search warrant*

The State accurately observes that the police could have conducted a *warrantless* search of the vehicle immediately by the side of the road on probable cause that it contained fruits of the crime of burglary, *e. g. State v. Barclay*, Me., 398 A.2d 794, 798 (1979). Also, the search without a warrant could have been done shortly after the vehicle had been towed to Officer Taylor's back field. If the search is promptly carried out after removal of the vehicle from the public highway to a more convenient location, the probable cause factor and exigent circumstances existing at the original point of seizure on the highway remain in force and a warrantless search at the removal area is constitutionally permissible. *State v. Morton*, Me., 397 A.2d 171, 176 (1979); *State v. Cress*, Me., 344 A.2d 57 (1975); *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

As stated previously the search of the car at the county jail yard did not take place immediately upon its removal; instead, the police secured a warrant before they searched the impounded vehicle two days after it had been removed to the yard. The defendant contends that the officers' procurement of the search warrant on the day following the removal of the automobile and the further delay of another day before its execution prolonged the warrantless detention of the vehicle unreasonably and fatally tainted the actual search, even though conducted under a search warrant. We disagree.

In *Chambers v. Maroney, supra*, 399 U.S., at 50, 90 S.Ct., at 1981, the Court said that,

"[f]or constitutional purposes, we see no difference between *on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate* and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

". . . there is little to choose in terms of practical consequences between an immediate search without a warrant and *the car's* immobilization until a warrant is obtained." (Emphasis supplied).

Where a search of the vehicle without a warrant could have been conduct-

ed promptly after its seizure without invasion of the defendant's Fourth Amendment rights, a search under warrant made within three days of the warrantless impoundment of the automobile was not unreasonable. Under Rule 41(d), M.R.Crim.P., search warrants may be executed and returned within ten days after the date of issue. The instant case did not present a situation where the issuance of the warrant would necessarily be based on stale information. At any rate, it is not incumbent upon law enforcement authorities to obtain a search warrant as soon as probable cause arises. The fact that the officers might have obtained a warrant earlier does not negate its constitutional availability under the circumstances of this case; absent a prompt warrantless search and there being no reasonable likelihood that the impounded vehicle could be moved away or meddled with by the defendant or others, the officers' procurement of a search warrant under such circumstances showed proper official sensitivity to constitutional Fourth Amendment rights. *See State v. Dunlap*, Me., 395 A.2d 821, 824 (1978); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

The use of the search warrant in this case was within the constitutional limitation of reasonableness on the part of the magistrate issuing it, as well as by the officers executing it. *See Buckley v. Beaulieu*, 104 Me. 56, 71 A. 70, 22 L.R.A., N.S., 819 (1908).

### 5. *Sufficiency of affidavit in support of search warrant*

Citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the defendant next contends that the search warrant was invalid, because it was based on a deliberately misleading affidavit. The case stands for the proposition that, if, in his affidavit for the search warrant, the affiant deliberately or with reckless disregard for the truth makes false statements which are necessary to establish probable cause, the search warrant must be voided and the fruits of the search suppressed to the same extent as if probable cause was lacking on the face of the affidavit. The case further indicates that the same rule would apply if the overall falsity of the affidavit arises out of the deliberate omission of facts negatory of probable cause.

From our review of the testimony at the suppression hearing (nothing at trial disputing it), we conclude the defendant has not sustained his burden of showing clear error on the part of the Justice below who held that the defendant failed to prove by the preponderance of the evidence that Officer Marston, the affiant, was guilty of intentional falsehood or reckless disregard for the truth, either in the statements he made or in the facts he omitted to disclose.

In testing the correctness of the Superior Court's decision on a motion to suppress evidence, we must apply the "clearly erroneous" rule. *State v. Walker*, Me., 341 A.2d 700, 702–03 (1975). Furthermore, an affidavit which on its face establishes probable cause will not be voided and the fruits of the search suppressed, unless the defendant proves by a preponderance of the evidence that the affiant intentionally or with reckless disregard for the truth made false assertions of material facts or omitted material facts known to be true. If such false statements proved necessary to the finding of probable cause or such omitted facts negated probable cause, then suppression would result. *See United States v. Smith*, 9th Cir., 588 F.2d 737, 739, (1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979); *United States v. Davis*, D.C.Cir., 617 F.2d 677 (1979).

Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit sufficient on its face to establish probable cause. *United States v. Astroff*, 5th Cir., 578 F.2d 133 (1978), and cases cited at note 1.

The Gothic Street observations omitted from the affidavit tended to support the establishment of probable cause, and in no way were they conducive to negating its existence. Under such circumstances, the challenge to the sufficiency of the affidavit must fail.

## III

### Defendant's Other Claims of Error

Finally, the defendant has raised several other claims of error which are not likely to recur. We need not consider them.

The entry will be:

Appeal sustained.

Judgments of conviction vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.